(USAO GAN 6/10) Search Warrant

**FILED IN CHAMBERS**
**U.S.D.C. - Rome**

APR - 1 2014

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# United States District Court
## NORTHERN DISTRICT OF GEORGIA

In the Matter of the Search of

FACEBOOK PAGES BEARING FACEBOOK PROFILES: THOMAS.SHORT.9081; FACEBOOK PROFILE TERRY.PEACE.92; FACEBOOK PROFILE CORY.WILLIAMSON.3998; AND FACEBOOK PROFILE BRIAN.CANNON.39; AND FACEBOOK PAGE BLOOD AND SCORCHED EARTH, FACEBOOK PAGE XXX MINUTEMEN MILITIA, ALL OF WHICH ARE MORE PARTICULARLY DESCRIBED IN ATTACHMENT A, WHICH IS HEREBY INCORPORATED BY REFERENCE

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**
Case number: 4:14-MC-14

I, Adam Rowland, being duly sworn depose and say:

I am a Special Agent of the Federal Bureau of Investigation and have reason to believe that on the property described as:

Facebook Profile Thomas.Short.9081; Facebook Profile Terry.Peace.92; Facebook Profile Cory.Williamson.3998; Facebook Profile Brian.Cannon.39, all of which are more particularly described in Attachment A, which is hereby incorporated by reference

in the Northern District of Georgia there is now concealed certain information and certain data, namely,

See Attachment B,

which constitutes evidence of a crime and property designed for use, intended for use, or used in committing a crime, concerning violations of Title 18, United States Code, Section(s) 371 and Title 26, United States Code, Section(s) 5861. The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT

Continued on attached sheet made a part hereof.

Sworn to before me, and subscribed in my presence

April 1,
~~March 31~~, 2014
Date

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer
AUSA Tracia M. King

Signature of Affiant
Adam Rowland

Rome, Georgia
City and States

Signature of Judicial Officer

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Adam Rowland, being first duly sworn, do hereby depose and state:

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been since October 2005. I am assigned to the FBI Office in Atlanta, Georgia, and work in the Rome Resident Agency ("RRA"), which is a satellite office of the Atlanta Office located in Rome, Georgia. At the FBI RRA, I investigate a variety of federal offenses, including domestic terrorism. I am also an Assistant Weapons of Mass Destruction Coordinator for the Atlanta Division of the FBI.

2. I make this affidavit in support of an application for a search warrant for information associated with

   - Facebook page with the Facebook Profile Thomas.Short.9081, with the Facebook page username Thomas Short (hereafter "**Subject Account 1**");
   - Facebook page with the Facebook Profile Terry.Peace.92, with the Facebook username Terry Peace (hereafter "**Subject Account 2**");
   - Facebook page with the Facebook Profile Cory.Williamson.3998, with Facebook username Cory Williamson (hereafter "**Subject Account 3**");
   - Facebook page with the Facebook Profile Brian.Cannon.39, with Facebook username Brian Cannon (hereafter "**Subject Account 4**");
   - Facebook page Blood and Scorched Earth (hereafter "**Subject

      **Account 5"); and**

- Facebook page XXX Minutemen Militia (hereafter "**Subject Account 6"**).

that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Palo Alto, California. The information to be searched is described in the following paragraphs and in Attachment A. This Affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the Government records and other information in its possession pertaining to the subscribers or customers associated with Facebook as described in Attachment A, which is hereby expressly incorporated by reference, including the contents of communications.

3. The statements in this Affidavit are based primarily upon my own investigation of this matter, but also upon information provided to me by FBI Special Agents, Analysts, and Task Force Officers. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth facts that I believe are sufficient to establish probable cause for the issuance of the requested search warrant. Unless specifically indicated otherwise, all conversations and statements described in this Affidavit are related in substance and in part only.

## BACKGROUND OF THE INVESTIGATION

4. On January 30, 2014, an online chat forum, which was monitored by FBI, took place on the XXX Minuteman Militia Facebook page (which **Subject Account 6**). During the online chat on that Facebook page, Terry PEACE ("PEACE"), using **Subject Account 2**, stated that between February 1, 2014, and February 15, 2014 an active revolution against the government would begin. PEACE encouraged members of the militia to review guerilla warfare tactics, small unit tactics, accumulate supplies, and prepare family. PEACE, in the same online chat conversation advised that "guerilla warfare primary targets included TSA, DHS, non-emergency FEMA, road blocks, etc."

5. An FBI confidential human source (COOPERATING WITNESS)[1] advised FBI that COOPERATING WITNESS was going to attend a meeting with PEACE in Memphis on February 5, 2014. Prior to leaving for the meeting, Brian CANNON, using **Subject Account 4**, participated in a Facebook Chat with Cory WILLAMSON ("WILLIAMSON") who used **Subject Account 3**, and the Cooperating Witness who used **Subject Account 1**. This chat occurred on **Subject Account 5**. During this chat, the Cooperating Witness advised that

---

[1] CHS-1 does not have any prior felony convictions or any pending charges. CHS-1 is providing information voluntarily and not in consideration of any potential criminal charges. CHS-1 has received compensation from FBI. As described further in this Affidavit, agents have been able to corroborate much of the information that CHS-1 has provided.

the Cooperating Witness may be late to the meeting due to the weather. Additionally, during this conversation, they discussed generally about having extra money to purchase items that could be used in the operation. CANNON, via **Subject Account 4**, advised that they were expecting a financial donation from an anonymous friend. WILLIAMSON responded that he planned to talk to person who could acquire items on his behalf.

6. On February 5, 2014, WILLIAMSON telephoned the COOPERATING WITNESS and advised that he was with CANNON and PEACE in Memphis. WILLIAMSON additionally sent a message from **Subject Account 3** to the Cooperating Witness, who used **Subject Account 1,** advising that he, PEACE and CANNON were together in a car and that they should find an alternate method to communicate with the Cooperating Witness due to the fact that the Cooperating Witness had not yet arrived.

7. On February 5, 2014, PEACE, via **Subject Account 2**, sent a Facebook message to the cooperating witness, who used **Subject Account 1**, in which PEACE requested information to access the secured chat site, which occurred on that day. This request occurred on Facebook page identified as **Subject Account 5**.

8. FBI Agents were present with Cooperating Witness and observed Cooperating Witness chat using www.chatcrypt.com. FBI Agents observed that there were only three participants to this chat: COOPERATING WITNESS, a person using

the moniker "Chief," and one other person. These chats were preserved as evidence.

9. During this monitored conversation, Chief wrote, "We will be using Guerrilla style warfare tactics. I have been arguing with myself on what level of violence or what level of damage is acceptable. I do not want to kill or injure fellow Americans. So, at least for the guys with me we will restrain the violence toward people and target infrastructure. Then respond to violence with reciprocal violence."

10. Chief further stated, "The group with me will move first mainly to make a point. I stand by what I say. The other groups should start within the next 24 – 48 hours in order to keep the operational tempo up so that when one unit is done another is hitting nonstop. As soon as we complete mission one, we will relocate and start mission 2 then 3, until all is done."

11. Chief additionally stated, "We will get a post up after we complete our mission, then you will know the clock is started."

12. As the online conversation continued, Chief talked about training, attacking small targets first, and then escalating to larger targets. Chief then described infrastructures as government vehicles, buildings, power, and communication. As the chat continued, Chief wrote, "if we can get decent intelligence could be obtained on roadblocks or VIPR etc, then we go after them with the understanding it would be violent."

13. On February 6, 2014, during a Facebook online chat between Cooperating Witness, who used **SUBJECT ACCOUNT 1**, and WILLIAMSON, who used **SUBJECT ACCOUNT 3**, WILLIAMSON made reference to items he needed for the operation. When COOPERATING WITNESS and WILLIAMSON discussed whether the group needed ammunition and explosives, WILLIAMSON advised that WILLIAMSON was not certain but that he believed it was covered. WILLIAMSON then stated that he would ask, unless COOPERATING WITNESS had resources to share. COOPERATING WITNESS advised that COOPERATING WITNESS was not certain, but COOPERATING WITNESS would ask his contact.

14. On February 8, 2014, during a recorded telephone call, COOPERATING WITNESS advised PEACE that COOPERATING WITNESS had a contact that could provide group with what it needed. COOPERATING WITNESS further advised PEACE that its contact wanted to know what the group needed the device to do so the contact would know what to make. PEACE responded that he needed "a thermite charge to go through the engine block of an MRAP." PEACE stated that most sheriffs and police departments have one or two.

15. Through open source research, I learned that a "MRAP" is a mine-resistant ambush protected vehicle, or an armored fighting vehicle.

16. Additionally during the February 8, 2014, recorded call, after COOPERATING WITNESS advised PEACE that COOPERATING WITNESS was writing down what PEACE requested, PEACE stated, "… if he can hook us up with say 12

pipe bombs that will be sweet." PEACE additionally added that PEACE wanted the pipe bombs constructed for "maximum fragmentation."

17. When COOPERATING WITNESS expressed that the contact may not be comfortable meeting or talking to PEACE, PEACE stated that COOPERATING WITNESS could be the middleman. PEACE also advised COOPERATING WITNESS that he would like to get these items within the next seven days.

18. A second FBI confidential human source (CHS-1) [2] reported to FBI that on February 8, 2014, CHS-1 and CANNON had a conversation in which CANNON stated that "the group" was planning to "start the fight" with the government by strategically planning to sabotage power grids, transfer stations, and water treatment facilities.[3] CANNON claimed this action would cause mass hysteria and if enough sabotage was successful, then martial law would be declared therefore triggering other militias to join the fight. CANNON claimed too many militias were in a defensive mode and in order to get them out of the defensive posture, actions would have to take place to force martial law to be declared.

19. CANNON advised that CANNON would invite CHS-1 to join a private Facebook chat where plans were being made. CANNON expressed a desire to recruit members from different regions of the United States to carry out these

---

[2] CHS-2 does not have any prior felony convictions or any pending charges. CHS-2 is providing information voluntarily and not in consideration of any potential criminal charges. Moreover, CHS-2 provided information independently from CHS-1.

[3] This communication was not recorded.

missions. The investigation revealed that CANNON has a FACEBOOK page, which is **Subject Account 4**.

20. On February 9, 2014, Cooperating Witness called CANNON and asked to speak to PEACE. Cooperating Witness further advised that Cooperating Witness had information for PEACE. CANNON responded that PEACE will be "elated." After PEACE came to the phone, Cooperating Witness advised PEACE that the contact can make the requested items, but that it will take a few days. PEACE replied that it was not a problem. PEACE told Cooperating Witness to let him know when the items are ready and that "they will head up there" to get them. PEACE and Cooperating Witness then spoke about meeting in Tennessee for delivery of the items to PEACE.

21. On February 10, 2014, WILLIAMSON sent a message via **Subject Account 3** to the Cooperating Witness in which WILLIAMSON advised that they would wait for the Cooperating Witness because the Cooperating Witness' role was vital to theirs.

22. On February 12, 2014, PEACE sent a message via **Subject Account 2** to the Cooperating Witness in which PEACE stated that "will go" Friday, no later than Saturday. The Cooperating Witness, using **Subject Account 1**, stated that the Cooperating Witness would speak to PEACE the next day to advise how things are going. The Cooperating Witness also stated in the same message that some of the parts may have to be obtained in Tennessee. Your affiant believes that PEACE's comment, viewed in context with the rest of the

message, is a reference to the operation planned by PEACE, CANNON and WILLIAMSON.

23. On or about February 14, 2014, Facebook username Tony Kinsey ("KINSEY") posted a message on WILLIAMSON's Facebook page, which **Subject Account 3**. In that message, KINSEY thanked God for the opportunity to "partake in the second American Revolution." He also thanked God for the "opportunity to kill the bad guys." KINSEY stated, "We will have to get dirty in our task." KINSEY also asked God to help "us to destroy those that make this world painful and miserable ..."

## FACEBOOK RECORDS

24. Facebook owns and operates a free-access social networking website of the same name that can be accessed at www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

25. Facebook asks users to provide basic contact information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

26. Facebook users can select different levels of privacy for the communications

and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, to all Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

27. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "Mini-Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

28. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. A

particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

29. Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

30. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

31. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

32. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

33. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

34. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

35. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; Mini-Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and

information about the user's access and use of Facebook applications.

36. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

37. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

38. Therefore, the computers of Facebook are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access

information, transaction information, and account application.

### **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

39. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B, which is hereby expressly incorporated by reference. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

40. Based on the forgoing, I request that the Court issue the proposed search warrant.

41. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States ... that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

42. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook

- Facebook page with the Facebook Profile Thomas.Short.9081, with the Facebook page username Thomas Short (hereafter "**Subject Account 1**");

- Facebook page with the Facebook Profile Terry.Peace.92, with the Facebook username Terry Peace (hereafter "**Subject Account 2**");

- Facebook page with the Facebook Profile Cory.Williamson.3998, with Facebook username Cory Williamson (hereafter "**Subject Account 3**");

- Facebook page with the Facebook Profile Brian.Cannon.39, with Facebook username Brian Cannon (hereafter "**Subject Account 4**");

- Facebook page Blood and Scorched Earth (hereafter "**Subject Account 5**"); and

- Facebook page XXX Minutemen Militia (hereafter "**Subject Account 6**").

that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Palo Alto, California.

## **ATTACHMENT B**

### Particular Things to be Seized

I.  Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a) All contact information, including full name, user identification number, birth date, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All Photoprints, including all photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

(c) All Neoprints, including profile contact information; Mini-Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook

applications;

(d) All other communications and messages made or received by the user, including all private messages and pending "Friend" requests;

(e) All IP logs, including all records of the IP addresses used to log into and out of the account;

(f) All information about the user's access and use of Facebook Marketplace;

(g) The length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number);

(h) All privacy settings and other account settings;

(i) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

II. Information to be seized by the Government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 26, United States Code, Section 5861; and Title 18, United States Code, Section 371, including information pertaining to the following matters:

(a) Records relating to plans, preparation and threats to attack government agencies, government facilities, and government personnel; and

(b) Records relating to the conspiracy to obtain explosives in violation of the law.